**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. BAH-24-77** |
| | ) | |
| **ALEKZANDER BYWATER,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT ALEKZANDER BYWATER'S MOTION TO SUPPRESS ELECTRONIC EVIDENCE**

The United States of America respectfully submits this Opposition to Defendant Alekzander Bywater's Motion to Suppress Electronic Evidence (ECF No. 115). The Motion seeks to suppress evidence on electronic devices that Bywater and his wife brought to the United States after their deportation from Mexico. Upon arriving in the United States, FBI seized the devices and sought a warrant to search them. None of the conduct that took place in the United States—including the search warrant issued to search the devices—is at issue in the Motion. Instead, the Motion focuses on alleged actions that took place in Mexico.

The Motion should be denied for multiple, mutually independent reasons. First, the FBI never seized the Bywaters' computers in Mexico. Mr. Bywater's wife, Anika Bywater, decided to bring the devices with them to the United States. Second, the standard for evaluating U.S. law enforcement conduct in a foreign country is *reasonableness*, and FBI personnel in Mexico acted reasonably at all times. Third, even assuming that illegal or unconstitutional conduct took place, that conduct was sufficiently attenuated from the FBI's ultimate seizure of the challenged evidence. Finally, the so-called "joint venture" doctrine is not supported by the facts.

# I. BACKGROUND

## A. Factual Background

### a. The Bywaters Create CSAM Depicting an Infant and Bywater Sells it Over the Internet

Alekzander Bywater ("Bywater") and his wife, Anika Bywater ("Anika"), sexually exploited a child and created at least two videos of the abuse while they were living in Mexico. The two videos were taken on separate occasions. Both Bywaters are citizens of the United States.

Bywater then uploaded those two files onto a website where users sell and otherwise share child pornography. An undercover FBI agent monitoring the website viewed Bywater's user profile and saw that the user was advertising the videos.

Both videos were advertised with explicit language that referred to sex acts with a child, and both of them depicted Bywater and his wife jointly abusing a minor. At the time the agent discovered one of the videos, it had already been rated by six other users of the website and had a rating of four out of five stars. The description of the video stated "Sorry for the poor audio hopefully I can repair my phone soon for better vids." The agent downloaded the videos within this district[1] and Bywater and his wife Anika were soon identified. Their faces are seen in the videos, along with the face of the victim, and several unique tattoos were visible.

### b. FBI Personnel in Mexico Accompany Mexican Immigration Authorities to the Bywaters' Home in Mexico

On February 13, 2024, the Bywaters were charged by criminal complaint in the District of Maryland with sexual exploitation of children. FBI agents in the United States consulted with their counterparts in Mexico to determine the proper course of action to ensure that the Minor Victim

[1] The offense of sexual exploitation of children—often referred to as "production of child pornography"—can be charged in a district into which the produced CSAM is transported, even if the underlying sexual abuse did not take place there. *See, e.g., United States v. Engle*, 676 F.3d 405, 416-19 (4th Cir. 2012).

was safe. At the motions hearing, the government intends to elicit testimony as to the following facts.

Upon learning of the Bywaters, FBI agents in the United States contacted FBI personnel based at the U.S. Embassy in Mexico City—specifically FBI Assistant Legal Attaches ("ALATs") Gabriela Betance, Greg Catey, and Richard Fennern. ALATs primarily serve as liaisons between U.S. and Mexican law enforcement, often on issues such as fugitives in Mexico who are wanted in the United States, Americans who are missing in Mexico, and Americans who are victims of kidnapping and other crime in Mexico. They have no authority to conduct their own independent investigations in Mexico. They do not carry firearms and do not make arrests or seize evidence without the involvement of Mexican law enforcement.

On February 16, 2024, the three ALATs met with Mexican immigration authorities in the city of Coatepec in the state of Veracruz, Mexico to try and locate the Bywaters. Among other things, they reviewed the Bywaters' social media accounts, which included photographs, along with data from Google returns. They then compared the photographs posted on the Bywaters' respective Facebook pages and distinctive images of what appeared to be their home in Veracruz. Using open source data from Google maps, the ALATs found a residence that appeared to match the photographs. The ALATs then provided this information to the Mexican immigration authorities (the Instituto Nacional de Migración, or "INMI") as well as Veracruz State Police, who were present to provide security for INMI.

INMI and Veracruz State Police approached the residence. The ALATs initially did not. They were on scene, but sat in a separate car on the block as Mexican authorities first tried to make contact and find the Bywaters. After INMI had entered the Bywaters' residence, an INMI agent told the ALATs that they had only found Anika Bywater at the house, but had yet to locate

Alekzander Bywater. Around this time, several neighbors in the area became confrontational with Mexican law enforcement personnel and tried to get them to leave. Due to the increasing dangerousness of the situation, and to reassure the irate neighbors that U.S. officials were aware of INMI's interactions with the Bywaters, ALAT Betance exited the car and approached the Bywaters' home. ALATs Catey and Fennern remained in the vehicle.

**c. Bywater Deposits his Electronic Devices with his Neighbors, But Anika—Not the FBI—Decides to Take Them to the INMI Station**

ALAT Betance approached the residence and told the neighbors that she worked for the U.S. Embassy and was aware that INMI was present at a home where U.S. citizens resided. At some point, ALAT Betance overheard Anika Bywater state that she believed Alekzander was upstairs. Mexican authorities located Alekzander upstairs in the residence hiding in a shower and wearing only a t-shirt. ALAT Betance told Anika to gather any items that were of value to her.

ALAT Catey exited the car and entered the home. INMI then told Bywater to collect his belongings, at which time he entered the upstairs bedroom and closed the door, eventually locking himself in with the devices. INMI agents told Alekzander that he needed to gather his things so that they could head to the INMI station for processing. Alekzander unplugged a computer tower and left the residence. His neighbors offered to take care of the computer for him, and Alekzander left the computer outside a neighbor's residence. He was then escorted to the INMI van.

Anika Bywater told ALAT Betance that she did not want to leave the computer with their neighbors. ALAT Betance told her that she could take whatever she wanted to take with her. Anika then decided to go pick up the computer tower and a laptop. At that time, ALAT Fennern was outside the residence. As Anika Bywater is a small person, ALAT Fennern offered to help her physically carry the computer tower and the laptop up the stairs toward the INMI van. ALAT Fennern then placed the devices in the front seat of the INMI van. Other than the brief assistance

that ALAT Fennern provided to Anika by carrying the computers from the neighbor's stoop to the INMI van, no one from the FBI touched the devices at any other point until the devices arrived in the United States.

Anika Bywater wanted to retrieve more items from the apartment, including a blanket that she found sentimentally valuable. Anika got the blanket from the home and went back outside. At that time, Alekzander, Anika, and the INMI officers left in the van to go to the INMI station. FBI were not in the van and did not have possession of the devices, which were in the INMI van with the Bywaters and INMI agents. The ALATs drove to the station separately. When they arrived, Alexander and Anika were sitting with all of their items, including the computers.

INMI officers offered the Bywaters food, toiletries, and the chance to take a shower. Then, a physician conducted a brief physical examination of the Bywaters. INMI officers then reviewed the Bywaters' immigration status and confirmed that they were subject to deportation. The FBI ALATs were not a part of that determination.

At approximately 4:00 pm, the ALATs left the INMI station. The Bywaters remained there to spend the night. The Bywaters maintained control over their devices, which stayed with them in the station overnight.

#### d. The Bywaters are Arrested in the United States, and the FBI Seizes the Devices and Obtains a Warrant to Search Them

The next day, INMI transported the Bywaters to the Benito Juarez International Airport in Mexico City. ALATs Betance and Catey joined them at the United Airlines check-in counter. ALAT Catey had brought a suitcase to help the Bywaters carry their things. Alekzander packed the laptop and computer tower in the suitcase wrapped in blankets. The suitcase was then checked in under normal processes with United Airlines. FBI at no point seized or maintain custody over the suitcase or any of the Bywaters' devices.

ALATs Betance and Catey went through security and rejoined the Bywaters before their flight back to Dulles International Airport. ALATs Betance and Catey provided the Bywaters breakfast as they waited for their flight. At 9:10 am, the Bywaters, several INMI officers, and ALATs Betance and Catey flew to Dulles on United Airlines flight 1567.

Once they landed, Customs and Border Patrol agents escorted Anika and Alekzander through the airport and they were placed under arrest pursuant to the federal arrest warrant. FBI seized the luggage pursuant to their arrest. During an interview with FBI agents, Bywater said that he did not know how the computer devices ended up in the INMI van. He further stated that he may have brought certain RAM sticks to the United States "by accident" after an American was "insistent" that he bring them. He mentioned no other involvement of Americans with the devices:[2]

| | |
|---|---|
| *FBI Agent:* | What did you bring back with you [from Mexico]? |
| *Bywater:* | Um, just some clothes, and, uh… |
| *FBI Agent:* | You brought computers? |
| *Bywater:* | Yeah. |
| *FBI Agent:* | What did you bring? |
| *Bywater:* | Just a desktop and a laptop. I didn't grab them, uh, I didn't grab them myself. My, like I said, they were, like, rushing everything. So actually it was my, uh, I don't know who grabbed it. I gave them to a neighbor, um, because I didn't want them being, you know, computers are sensitive stuff, I didn't want it flying around. So I gave it to a neighbor… |
| *FBI Agent:* | Yeah, you're endangering your shit or whatever. [Cross-talk.] |

[2] These statements are included in the recording of Bywater's interview with the FBI, ECF No. 118-1 at 24:09-25:49 (non-substantive interjections omitted). They are subject to Bywater's other motion to suppress his statements. ECF No. 118. These statements were made after Bywater received his *Miranda* warnings but before he raised the possibility of getting a lawyer.

| | |
|---|---|
| *Bywater:* | Yeah, well, I mean, you know, that's actually mostly online. I just mean, like, the hardware itself, I didn't want things getting damaged and what not. And um… |
| *FBI Agent:* | So that's what's in the, in the briefcase. |
| *Bywater:* | Yeah. |
| *FBI Agent:* | And then you have a couple carry-on bags? [Cross-talk.] |
| *Bywater:* | So I gave that to somebody else and then somehow it ended up coming with us. Um… |
| *FBI Agent:* | Okay. And carry-on bags, right? |
| *Bywater:* | Yeah. |
| *FBI Agent:* | What did you put in it—memory, or is it a hard drive? They saw you [inaudible because of cross-talk]… |
| *Bywater:* | No, RAM RAM sticks. |
| *FBI Agent:* | RAM? Why did you take that out? |
| *Bywater:* | I didn't take that out. Uh, well, it's definitely not, a while ago, I don't know why it got taken with us. |
| *FBI Agent:* | Well, you brought it—didn't you? |
| *Bywater:* | Um, well, kind of on accident. Well, I don't know if I brought it. I was grabbing things and it was next to the computer and um, he was insistent that I grab it. |
| *FBI Agent:* | Who's he? Immigration guy? |
| *Bywater:* | No, the uh, American guy. |
| *FBI Agent:* | Consulate? |
| *Bywater:* | Yeah. |

These statements are consistent with the FBI's recounting of events.

On February 26, 2024, the Honorable A. David Copperthite authorized a search warrant for the Bywaters' luggage, including any digital devices. A subsequent search of the digital

devices in the luggage revealed copies of the videos that Bywater sold over the internet, other videos that appear to depict an adult male's hand sexually assaulting the Minor Victim in this case, evidence of the computer user's attempts to sell child pornography over the internet, and other child pornography files.

### B. Procedural History

On February 13, 2024, Defendant was charged by criminal complaint with sexual exploitation of children in violation of Title 18, United States Code, Sections 2251(a), (d), and (e). (ECF No. 5). Bywater's initial appearance was held on February 21, 2024. (ECF No. 16). A redacted version of the complaint was unsealed by Court order on February 22, 2024. (ECF No. 23). Bywater was ordered detained by consent on February 26, 2024. (ECF No. 30). On April 4, 2024, Bywater was arraigned and entered a plea of not guilty. (ECF No. 40). On December 10, 2025, Bywater's Co-Defendant and wife, Anika Bywater, pleaded guilty to an Information charging her with one count of conspiracy to engage in illicit sexual conduct in foreign places in violation of Title 18, United States Code,

On February 2, 2026, a scheduling order was issued. (ECF No. 94). On April 13, 2026, Bywater filed his Motion to Suppress Electronic Evidence. (ECF No. 115). The motions hearing in this matter is set for July 1, 2026. (ECF No. 96).

## II. ARGUMENT

Bywater contends that FBI and Mexican authorities were in a "joint-venture" and therefore, Fourth Amendment protections apply. (Def.'s Mot. Suppress Electronic Evidence ["Mot."], ECF No. 115, at 3). He then argues that FBI illegally seized the devices in Mexico and brought them to the United States "for the sole purpose of handing them over to United States law enforcement." (*Id.*). Bywater is incorrect on the facts and the law.

### A. No U.S. Law Enforcement Agent Seized or Searched the Devices Before the Bywaters' Arrest in the United States

First, there is no basis for suppression because FBI never seized the devices in Mexico. Instead, except for one brief moment, the devices were never in the FBI's custody or control, and the FBI never compelled or ordered the Bywaters to do anything with the devices.

Instead, Bywater, after hiding in a shower, attempting to remove the RAM from a computer, and locking himself in a room with his computers, decided he wanted to leave his computers outside his neighbor's house. He was the one who brought the devices to an area outside his neighbor's house and left them there. He was then escorted to the INMI van.

It was Anika Bywater—not the FBI—who felt that the neighbors might take their things and did not want to leave the computers there. She is the one who went to pick them back up and did in fact physically retrieve the computers from outside of the neighbor's house. At no point did "law enforcement return[] to the neighbor's home" to "illegally seize[] these computers." The only time that FBI even had physical contact with the devices is when Anika Bywater was struggling to carry them and ALAT Fennern offered to carry them to the INMI van for her. This was thus done with the consent of Anika Bywater. ALAT Fennern left the devices in the INMI van and the Bywaters retained control over the devices at the INMI station, where they stayed overnight, through when they checked the devices in a bag at the airport.

Testimony will demonstrate as much. None of the ALATs would have made such an instruction. Bywater is correct that, of course, digital devices are of investigative significance in a production of child pornography case. Nonetheless, the government will introduce evidence that law enforcement did not go to the neighbor's home and illegally seize the devices. Anika Bywater was worried that they would potentially get stolen and she, not the FBI, decided to retrieve them.

**B. <u>All Actions Taken by FBI Personnel in Mexico Were Reasonable</u>**

In his Motion, Bywater repeatedly castigates the FBI for not seeking a warrant to seize his devices, and he claims that they thus did so "illegally." Mot. at ¶¶ 6, 8, 10. As noted above, the FBI never seized the devices. But even if it had seized Bywaters' devices in some manner, there would still be no basis for suppression.

The Motion identifies only one basis for why any seizure was supposedly illegal: the lack of a warrant. But a U.S. judge obviously cannot issue a warrant for property located in Mexico, and any such warrant "would be a dead letter outside the United States." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274 (1990). As a result, courts have held that the Fourth Amendment's warrant requirement does not extend to investigative activity conducted by American agents in other countries. *See, e.g.*, *United States v. Stokes*, 726 F.3d 880, 893 (7th Cir. 2013) (holding that "the Fourth Amendment's warrant requirement, and by extension the strictures of the Warrant Clause, do not apply to extraterritorial searches by U.S. agents"); *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157, 167 (2d Cir. 2008) (holding that "the Fourth Amendment's warrant requirement does not govern searches conducted abroad by U.S. agents; such searches of U.S. citizens need only satisfy the Fourth Amendment's requirement of reasonableness"); *see also Verdugo-Urquidez*, 494 U.S. at 278 (Kennedy, J., concurring) ("The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country.").

Instead, the actions of U.S. law enforcement in a foreign country are subjected to a standard of reasonableness. *Terrorist Bombings*, 552 F.3d at 167. Reasonableness under the Fourth

Amendment requires an examination of the totality of the circumstances. *See United States v. Knights*, 534 U.S. 112, 118 (2001).

The word "reasonable" appears nowhere in Bywater's Motion. But even if it did, his Motion would still fail because nothing that the FBI did in Mexico while accompanying INMI was unreasonable within the meaning of the Fourth Amendment.

As noted above, the FBI ALATs in Mexico agents never seized the devices in a manner that deprived the Bywaters of any possessory interests in them. ALAT Fennern handled the devices only momentarily, and he did so only to assist Anika after she expressed her desire to bring the devices with her to the INMI van. No FBI personnel grabbed or made away with the devices or threatened or ordered the Bywaters to take them. Even in Bywater's post-arrest statement to the FBI, the most pressure that an ALAT might have applied was to be "insistent" that Bywater take a RAM stick with him to the United States. To the extent that agents had an incentive to facilitate the transport of potential evidence of an exceptionally serious crime to a location where a U.S. judge could issue a warrant to search it, that is hardly unreasonable.

Bywater's other likely arguments for unreasonableness fail. He claims, for example, that FBI agents "circumvented the United States' extradition treaty with Mexico regarding criminal arrest warrants by persuading Mexico to simply deport Mr. Bywater back to the United States." Mot. at ¶ 3. As noted above, however, the decision to deport the Bywaters was one made by the Mexican government, not the FBI, and Bywater provides no facts for the extraordinary claim that the FBI can control immigration and extradition decisions made by the Mexican government.[3]

[3] In addition to being unsupported by facts, this claim is all the more extraordinary given that the Mexican government is currently demanding information from the United States about whether U.S. intelligence operatives were working in Mexico without authorization in violation of Mexican law. *See* Paulina Villegas, "Mexico Says 4 Foreigners Were at Cartel Raid Where 2 C.I.A. Officers Died," New York Times (Apr. 28, 2026) (noting that Mexican President Claudia Sheinbaum "has also demanded information from the United States to clarify the role of the two C.I.A. agents in the operation to determine whether it violated

Furthermore, extradition treaties do not provide the exclusive means by which a criminal suspect may be surrendered to another country. *See, e.g.*, *United States v. Alvarez-Machain*, 504 U.S. 655, 664-65 (1992).

Bywater's argument also gives zero credence to the very reasonable position that Mexican officials may not wish for non-citizens who sexually abused a child to remain in their country. Nor does he offer any conceivable reason why U.S. authorities should be penalized for the speedy return of U.S. citizens who engaged in such atrocious conduct on foreign soil.

Bywater also wrongly claims that law enforcement officers were "intentionally dishonest" about their reasons for being at his home in Mexico, and they claimed to be there because of a problem with the Bywaters' visa. Mot. at ¶ 5. This argument fails for multiple reasons. For one, it is self-evidently true that the Bywaters' legal ability to remain in Mexico was in doubt, as they were ultimately arrested and deported by Mexican immigration authorities. In addition, it was hardly unreasonable for FBI personnel not to disclose the existence of an arrest warrant for the Bywaters at the time. After all, after their departure from their home in Veracruz, the Bywaters spent the night in immigration detention, traveled to the airport in Mexico City, waited at the airport, and then took a multi-hour flight from Mexico City to Washington, D.C. Disclosing the arrest warrant to them would have introduced serious security and safety issues into an already complex scenario.

Overall, the FBI ALATs acted reasonably at all times. Bywater does not and cannot identify anything they did that would have been unreasonable within the meaning of the Fourth Amendment.

---

Mexico's security laws, which bar foreign agents from operating in the country without prior federal authorization."), available at https://www.nytimes.com/2026/04/28/world/americas/mexico-crash-cia-officers.html (last visited Apr. 29, 2026).

### C. Even if Bywater Could Identify Any Unreasonable, Illegal Government Action, Suppression is Still Unwarranted

Even if the FBI had acted in some unreasonable or illegal manner at the Bywaters' home in Veracruz, suppression would still be unwarranted. This is because, among other reasons, the relationship between the FBI's supposed seizure of the devices in Mexico and their ultimate arrival in the United States is too attenuated to justify the application of the exclusionary rule.

Under the "attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Utah v. Strieff*, 579 U.S. 232, 238 (2016) (cleaned up) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)). Put differently, "not all evidence conceivably derived from an illegal search need be suppressed if it is somehow attenuated enough from the violation to dissipate the taint." *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002). In assessing whether the evidence is sufficiently attenuated from unconstitutional conduct, courts look to the specific facts and circumstances of each case, and particularly to three factors: (1) "the presence of intervening circumstances," (1) "the amount of time between the illegal action and the acquisition of the evidence," and (3) "the purpose and flagrancy of the official misconduct." *Id.* Not every factor needs to weigh in favor of the United States for the evidence to be admissible. *See United States v. Seidman*, 156 F.3d 542, 549 (4th Cir. 1998).

Nevertheless, every factor does weigh in favor of the United States. The presence of intervening circumstances does so heavily. Bywater's theory is that the FBI illegally seized his devices at his home in Mexico. But this ignores what happened moments later: that is, *the FBI gave those devices right back to the Bywaters*. The FBI did not have custody over the devices

when they all traveled to the INMI station. Nor did the FBI take the devices overnight when the Bywaters were in INMI custody. The ALATs went back to Mexico City and the devices stayed with the Bywaters. Nor did the FBI take custody of the devices upon meeting the Bywaters at the Mexico City airport the following morning. Instead, they provided Bywater with a suitcase, and he packed the devices in them. The Bywaters then checked that suitcase with the airline. The Bywaters had custody of the devices for this long stretch of time until they were seized by FBI agents in the United States, and yet they took no further steps to leave their devices behind in Mexico. "[V]oluntary consent is the quintessential act of free will," and it is sufficient to purge any taint from illegal conduct. *Seidman*, 156 F.3d at 549 n.10. This intervening circumstance thus weighs heavily against suppression.

The amount of time between the supposedly illegal action and the acquisition of the evidence likewise weighs in favor of the government. Law enforcement approached the Bywaters' residence in Veracruz in the morning of February 16, 2024. The Bywaters landed at Dulles mid-afternoon the following day. More than 24 hours therefore elapsed between the supposed illegal law enforcement action in Mexico and the FBI's uncontested seizure of the devices in the United States. Just last month, the Fourth Circuit observed that it had previously found small periods of time "sufficient to pure the taint of an illegal search," and it cited cases in which the period of time in question was "one hour" or just "moments." *United States v. Lowers*, 170 F.4th 134, 159 (4th Cir. 2026) (citing *Seidman*, 156 F.3d at 549; and *United States v. Hooker*, 54 F.3d 774 (Table), at *2 (4th Cir. 1995)).

Lastly, the purpose and flagrancy of the violation likewise favor the government. The Fourth Circuit has clarified that this factor refers to "more than a technical Fourth Amendment violation"—instead it means "an *abusive* violation of the Fourth Amendment." *Lowers*, 170 F.4th

at 160 (cleaned up; emphasis in original) (quoting *Brown v. Illinois*, 422 U.S. 590, 610 (1975) (Powell, J., concurring)).

As noted above, there was no Fourth Amendment violation here at all. But even if there was, it was very far from flagrant. Bywaters' Motion challenges the actions of FBI personnel operating in a foreign country. At most, one individual handled the contested evidence for a matter of moments and with the consent of Bywater's wife. And FBI sought and obtained a warrant for the evidence once it arrived in the United States. Bywater does not and cannot identify any egregious conduct that the ALATs supposedly engaged in, nor does he cite a single case establishing that any such conduct in a foreign country is unreasonable, illegal, or flagrant.

The lack of any egregious law enforcement misbehavior cuts strongly against suppression here. The exclusionary rule is not a "personal constitutional right" nor is it intended to "redress the injury" caused by an unconstitutional search. *Davis v. United States*, 564 U.S. 229, 236 (2011). Instead, it exists only to deter future Fourth Amendment violations, and it can only be justified when its "heavy costs" are outweighed by the need to deter law enforcement misconduct. *Id.* at 237. This requires an assessment of the flagrancy of the law enforcement conduct, and suppression cannot be justified by mistakes or mere negligence. *Herring v. United States*, 555 U.S. 135, 143, 145 (2009). Here, there is no law enforcement misconduct to deter, much less flagrant misconduct, and the heavy costs of suppression thus cannot be justified.

**D. <u>The Joint Venture Doctrine Does Not Apply</u>**

Further, the "joint venture doctrine" does not apply here. There is relatively sparse caselaw within the Circuit on the doctrine. Nonetheless, the joint venture doctrine stands for the premise that although "United States cannot dictate the protections provided to criminal suspects by foreign nations," Fourth Amendment protections may attach where a United States agency forms an agency relationship with foreign officials. *See United States v. Abu Ali*, 528 F.3d 210, 227 (4th

Cir. 2008); *see also Pfeifer v. United States Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980)). As such, Fourth Amendment protections might attach to "statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings," where federal agents "substantially participated." *See Ali*, 528 F.3d at 228. "Only a few cases illuminate what constitutes 'active' or 'substantial' participation." *Id.* However, in *United States v. Ali*, the Fourth Circuit outlined the following examples:

> *See Yousef,* 327 F.3d at 144–46 (finding no active participation when there was no evidence that the United States had "encouraged, requested, or participated in [suspect's] interrogation or written statement" and United States agents did not receive any statement from foreign authorities until after suspect was in United States custody); *Heller,* 625 F.2d at 599–600 & n.7 (finding no joint venture when American law enforcement was only "peripheral[ly]" involved in suspect's arrest, *Mirandized* the suspect when questioning him, and did not exchange information with British authorities regarding separate un-*Mirandized* interrogation of suspect by the British); *Pfeifer,* 615 F.2d at 877 (finding no substantial participation when an American Drug Enforcement Agency (D.E.A.) agent was present during interrogation, but there was no evidence that the agent instigated any questioning or took any part in it); *United States v. Emery,* 591 F.2d 1266, 1268 (9th Cir. 1978) (finding substantial participation when American D.E.A. agents contacted Mexican officials about suspected drug activity, coordinated the relevant surveillance, supplied personnel in the sting operation, signaled appropriate time to arrest suspects, and were present at suspect's interrogation); *United States v. Trenary,* 473 F.2d 680, 682 (9th Cir. 1973) (finding no joint venture when American customs officer, who never identified himself as an American agent, translated questions asked by Mexican police officers).

*Id.* at 228–29. These cases all relate to unmirandized statements, but are helpful in establishing the level of involvement necessary for a federal agency to be deemed as substantially participating in a foreign investigation. Indeed, general cooperation between the FBI and a foreign government, standing alone, does not establish an agency relationship. *United States v. Dugan*, 136 F.4th 162, 170 (4th Cir. 2025) (citing *Ali*, 528 F.3d at 229).

Bywater has not established that the conduct by the FBI ALATs was sufficiently "substantial" to trigger the doctrine. As Agents will testify to at the hearing, their primary role was to alert Mexican authorities of potentially dangerous individuals living within their country after the Bywaters were charged in this District. They assisted by helping locate the Bywaters using open source data and giving that information to authorities. Their involvement at the scene was minimal. ALAT Betance primarily served to diffuse a tense situation between Mexican authorities and the Bywaters' neighbors. She also assisted in translating and explaining, to the extent that was reasonable at that stage of the case, why investigators were present at the home. ALAT Fennern physically touched the devices, but only to briefly help Anika Bywater carry them to the INMI van. It was her decision to retrieve them—she was never directed to do so. The facts upon which Bywater relies are speculative and largely inaccurate. They should be rejected. *See United States v. Sanders*, 107 F.4th 234, 254 n.16 (4th Cir. 2024) ("rejecting joint venture argument as "pure hopeful speculation" where a defendant could not establish facts before the district court that FBI was outsourcing its investigative processes to the foreign country); *United States v. Pierson*, 73 F.4th 582, 589 (8th Cir. 2023) (no joint venture when U.S. agents help foreign law enforcement locate a suspect; solicit a search of his home; receive from foreign law enforcement all plans on arresting, searching, and seizing evidence; being present at and videotaping the search and seizure; and request that he be surrendered to the United States).[4]

Even if the doctrine did somehow apply, for the reasons set forth above, there was no seizure. Anika Bywater voluntarily retrieved the computers from outside the neighbor's home. Neither Alekzander nor Anika were compelled in any way to do so. Moreover, they retained

[4] It is unclear how the doctrine would even function here. The doctrine serves to extend U.S. protections to conduct by foreign governments. Bywater alleges that FBI unlawfully seized the devices. This is unlike the, still largely rejected, cases where foreign governments interrogated defendants in concert with U.S. agencies and violated some constitutional right.

control over the devices until they arrived in the United States and were placed under arrest. Investigators never went into the neighbor's home to illegally seize the devices—indeed, the devices were never even inside the home. The caselaw Bywater cites is entirely inapposite and even if it were to apply here and an agency relationship were somehow established, there is no unlawful conduct upon which to attach Fourth Amendment protections. The Motion should be denied.

## III. CONCLUSION

For these reasons, the United States respectfully requests that the Court deny Defendant Alekzander Bywater's Motion to Suppress Electronic Evidence (ECF No. 115).

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By: ___*/s/*________________________
Kyle Reynolds
Special Assistant United States Attorney
Reema Sood
Assistant United States Attorney